**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
WACO DIVISION

| | | |
|---|---|---|
| JANE DOE, a minor child, | § | |
| by and through her next friends, | § | |
| MARY DOE and JOHN DOE; | § | |
| | § | Case No.  6:23-cv-566 |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| LORENA INDEPENDENT SCHOOL | § | |
| DISTRICT, and APRIL JEWELL; | § | |
| | § | |
| Defendants, | § | |

<u>**COMPLAINT AND JURY DEMAND**</u>

TO ALAN D. ALBRIGHT, UNITED STATES DISTRICT JUDGE:

NOW COMES Plaintiff Jane Doe, a minor, by and through her next friends, Mary and John Doe,[1] and her attorneys, The Fierberg National Law Group, PLLC and William Johnston of the law firm Loncar Lyon Jenkins, and assert claims against Defendants Lorena Independent School District ("School District") and April Jewell under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq.* ("Title IX") and 42 U.S.C. § 1983, and states and alleges as follows:

**INTRODUCTION**

1.      During the 2020-2021 academic year, School District employee Nicolas Crenshaw sexually abused Jane Doe multiple times when she was a five-year-old pre-kindergarten student at Lorena Primary School – including by digitally penetrating her vagina, forcing her to touch and rub his penis, and seating her on his lap for his own sexual arousal and gratification – in the

---

[1] Plaintiff and her parents, Mary and John Doe, as next friends, are contemporaneously filing a Motion for Leave to Proceed Under Pseudonym to protect Jane's identity and privacy as a minor and survivor of criminal sexual abuse.

classroom and often when he was lying with her under a blanket at nap time. Crenshaw's manipulation and emotional abuse of Jane included calling her his "girlfriend," telling her that his abusive acts were "games" and their "secret," and threatening Jane that she would get in trouble if she told anyone.

2.      Crenshaw eventually pleaded guilty to sexually abusing Jane and a four-year-old female classmate ("Student A"). At Crenshaw's sentencing hearing, the Waco prosecuting attorney remarked that Crenshaw committed "repeated and unspeakable evil against two of the most vulnerable and innocent persons in our community. **He is the definition of a predator hiding among those who chose to look the other way**."

3.      School District personnel who "chose to look the other way" included, among others, the Lorena Primary School Principal, April Jewell, Lorena Primary School Vice Principal, Denae Gerik, and pre-kindergarten lead teacher, Stephanie Heslep. They knew from their own observations, multiple employees' credible complaints about Crenshaw's inappropriate interactions with Jane Doe, and photographic evidence that Crenshaw routinely laid down under a blanket with Jane during nap time, had her straddle him while he was lying down, placed her on his lap, dressed her in his clothing, isolated her in the classroom and behind locked doors, and was otherwise obsessed with the young child. At the same time, school officials knew that Jane complained of vaginal and stomach pain.

4.      With deference to the Waco prosecutor, these school officials did more than "look the other way" because they made it easier for Crenshaw to hurt Jane, and harder for conscientious employees to intervene, by eliminating supervision of Crenshaw, permitting him to have unmonitored access to Jane behind locked doors, retaliating against employees who reported his highly inappropriate conduct with Jane, failing to properly investigate him, and failing to report

his misconduct to Jane's parents, Child Protective Services, or law enforcement. Defendants' determined indifference to Crenshaw's sexual harassment of Jane, which undoubtedly emboldened him and resulted in him abusing Jane with impunity, likely resulted from, but in no way is excused by, a lack of education, training, and policies on preventing, recognizing, and investigating teacher-on-student sexual harassment.

5.     The burden of stopping Crenshaw's heinous sexual abuse ultimately rested on the tiny shoulders of Jane Doe and Student A, and it is solely due to their courage that he now is behind bars and cannot harm other children. On May 7, 2021, when Jane was not in the classroom, Crenshaw turned his predatory focus on Student A and touched her genitalia under her clothes at nap time. That night, Student A told her parents that Crenshaw "put his hand down my panties." On June 13, 2021, Jane disclosed to her parents that Crenshaw had sexually abused her. Crenshaw was arrested, criminally charged, pleaded guilty to multiple counts of criminal sexual conduct against Jane and one count against Student A, and is incarcerated for a minimum of 40 years.

6.     When Mary and John Doe reasonably inquired as to how Crenshaw was able to abuse Jane Doe so many times at school and, presumably, under Defendants' watch – subject matter of great significance to the Does, the public, and the safety and well-being of children –the School District disparaged the Does and claimed they were only out to attack the school. Even so, the School District refused to perform a Title IX investigation let alone provide meaningful answers to serious questions.

7.     The School District, Defendant Jewell, and other administrators and employees – the very institution and purported professionals that children are taught to obey and respect, and in which parents place their trust – facilitated Crenshaw's rape and molestation of Jane Doe. Defendants' acts and omissions caused Jane to suffer, among other things, post-traumatic stress

disorder ("PTSD"), physical pain, anxiety, anger, nightmares, fear, and distrust of others. Jane understandably is afraid of attending school and often tries to avoid it altogether. Plaintiff seeks recovery from Defendants for the severe physical, emotional, educational, and other injuries that Defendants caused her, which are reasonably expected to continue throughout her lifetime.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the claims involve questions of federal law under 42 U.S.C. § 1983 and Title IX.

9.      This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1343(a)(3) & (4) because this litigation involves claims for the deprivation of Jane Doe's civil rights and rights secured by the U.S. Constitution.

10.     Venue in this District is proper pursuant to 28 U.S.C. § 1391, as a substantial part of the events and omissions giving rise to the claims in this case occurred in this judicial district.

## PARTIES

11.     Plaintiff Jane Doe, a minor, is a resident of Collin County, Texas.

12.     Mary Doe and John Doe are the natural parents of Jane, and they are residents of Collin County, Texas.

13.     Defendant Lorena Independent School District is a recipient of federal funds within the meaning of 20 U.S.C. § 1681(a). The School District geographically lies within McLennan and Falls County, Texas.

14.     At all relevant times, Defendant April Jewell was employed by the School District as the Principal of Lorena Primary School. Upon information and belief, Defendant Jewell resides in McLennan County, Texas.

## FACTUAL ALLEGATIONS

### *Lorena Primary School, Administration, and Staff*

15.     Lorena Primary School is located in Lorena, Texas, and it is a school within the School District.

16.     Lorena Primary School offers classes for pre-kindergarten through second grade and has approximately 400 students.

17.     At all relevant times, Defendant April Jewell was the Principal of Lorena Primary School.

18.     Defendant Jewell's responsibilities included monitoring, supervising, and evaluating all personnel and staff at Lorena Primary School.

19.     At all relevant times, Denae Gerik was the Vice Principal of Lorena Primary School.

20.     At all relevant times, Stephanie Heslep was a pre-kindergarten teacher at Lorena Primary School.

21.     In October 2020, the School District employed Crenshaw as a long-term substitute teacher at Lorena Primary School.

### *Crenshaw Groomed and Sexually Harassed Jane Doe in the Fall of 2020*

22.     During the 2020-2021 academic year, Jane Doe turned five years old, and she attended pre-kindergarten at Lorena Primary School.

23.     Ms. Heslep was the lead teacher for Jane's class.

24.     Crenshaw primarily worked with Jane's class.

25.     Ms. Heslep routinely permitted Crenshaw to lie under a blanket and/or his hoodie with Jane at nap time when the lights in the classroom were turned off.

26.     By the end of October 2020, a classroom special education aide, Melinda Sams, observed that Crenshaw showed overt favoritism to two female students – Jane Doe and Student A – by frequently placing them on his lap, having them wear his hoodies, and allowing them to use his phone during school hours. Most troubling, Ms. Sams observed Crenshaw wait until the other students were asleep before going and lying with Jane under a blanket at nap time.

27.     Crenshaw's behaviors made Ms. Sams uncomfortable, and in late October or early November 2020, she reported Crenshaw's inappropriate conduct to Ms. Heslep.

28.     Ms. Heslep claimed she spoke with Crenshaw to counsel him on his behavior.

### In January and February 2021, Two Employees Reported Crenshaw's Sexual Harassment to Defendant Jewell and Vice Principal Gerik

29.     Crenshaw's behavior improved for a short period of time, at least when he was in the presence or view of class aides and other school personnel.

30.     At the beginning of the new year, Crenshaw resumed his sexual harassment of Jane Doe.

31.     Ms. Sams, who previously reported Crenshaw, saw him again engaging in inappropriate conduct with Jane and Student A, including lying with Jane under a blanket at nap time.

32.     Ms. Sams took photographs capturing Crenshaw's misconduct, one showing Crenshaw lying with Jane at nap time, with Jane straddling him.

33.     In January 2021, Ms. Sams reported Crenshaw's inappropriate conduct to Vice Principal Gerik, showed her the photographs, and asked that the school address Crenshaw's behavior.

34.     Vice Principal Gerik stated she would talk to Principal Jewell.

35.     On or near February 4, 2021, Principal Jewell called Ms. Sams to her office to meet with her and Vice Principal Gerik.

36.     Principal Jewell asked Ms. Sams why she felt the need to take photographs of Crenshaw.

37.     At no time did Principal Jewell ask to see the photographs herself.

38.     Principal Jewell claimed that because of the photographs she would "have to go to Rusty."

39.     Upon information and belief, Principal Jewell was referring to Rusty Grimm, the School District's Director of Support Services who purportedly was responsible for Title IX compliance.

40.     It is unknown whether Principal Jewell ever notified Mr. Grimm of Crenshaw's reported misconduct and the photographs capturing his illicit contact with Jane.

41.     Principal Jewell treated Ms. Sams as though she did something wrong by reporting Crenshaw's inappropriate behavior and taking the photographs, and as a result, Ms. Sams left the School District for a different job around the first week of March 2021.

42.     Upon information and belief, in January 2021, another school employee, Toni Peebles, an instructional aide at Lorena Primary School, also complained to Principal Jewell about Crenshaw's misconduct with Jane.

43.     The School District did not investigate Crenshaw, and Defendant Jewell failed to properly supervise him.

44.      Although the School District was required to report Crenshaw's misconduct to Jane's parents pursuant to Texas law, it failed to do so. *See* Tex. Educ. Code Ann. § 21.0061.

### *A Third Employee Reported Crenshaw to Administration*

45.     The School District employed Marie Willis as a PASS Coach to handle behavior intervention at Lorena Primary School.

46.     During the 2020-2021 academic year, Ms. Willis spent more time than usual working with children in the pre-kindergarten classroom for which Ms. Heslep and Crenshaw were the teachers.

47.     Children in Ms. Heslep and Crenshaw's classroom soiled themselves, smeared feces on the wall, ran out of the classroom, and engaged in other behavioral outbursts.

48.     Despite this recurring behavior, when Ms. Willis went to Crenshaw's class, he would focus solely on Jane Doe and Student A even though other students obviously needed his attention.

49.     Ms. Willis saw Crenshaw regularly have Jane sit on his lap, wear his clothes around school, and have Jane hold his hand.

50.     Ms. Willis regarded Crenshaw's behavior toward Jane and Student A as inappropriate, and it made her uncomfortable.

51.     During the first part of March 2021, Ms. Willis informed Principal Jewell of Crenshaw's inappropriate behavior toward Jane Doe and Student A.

52.     During that meeting, Principal Jewell asked Ms. Willis if she had seen the photographs of Crenshaw depicting some of the behaviors and acts that had made her uncomfortable.

53.     Ms. Willis responded that she had not seen all the photographs, but that she witnessed Crenshaw regularly having Jane sit on his lap, wear his clothes around school, and hold his hand, and that those behaviors and actions by Crenshaw were inappropriate.

54.     Defendants did not inform Jane's parents of Crenshaw's alleged sexual misconduct against their daughter.

55.     Just as before, Defendants did not properly investigate Crenshaw and refused to take any meaningful action to protect Jane, including by increasing supervision of Crenshaw or her.

56.     In fact, Defendants did just the opposite and took actions that rendered Jane Doe even more susceptible to Crenshaw's sexual harassment and abuse.

### Defendants Eliminated Supervision of Crenshaw, as Jane Doe Complained of Vaginal and Stomach Pain

57.     In March 2021, following Ms. Willis' report of Crenshaw's misconduct to Principal Jewell, Defendants split the pre-kindergarten students into smaller groups of four to five students for parts of the day, and they appointed Crenshaw as the only teacher for Jane's sub-group, during which time he was the sole adult present with Jane.

58.     On multiple occasions, Ms. Willis responded to students with audible behavior concerns like crying and screaming coming from Crenshaw's room, only to find the classroom door locked and Crenshaw as the sole adult in the room with the students.

59.     It was unusual for teachers and staff to lock classroom doors, especially when there was only one teacher or staff member present.

60.      Ms. Willis witnessed students who were visibly upset about having to go into the room with Crenshaw.

61.     In mid-March 2021, Jane Doe began screaming, crying, and begging her parents to allow her to stay at home and not go to school.

62.     On March 31, 2021, Jane Doe was sent to the school nurse because she complained that her stomach hurt.

63.     Jane told her lead teacher, Ms. Heslep, that "it hurts when [she] go[es] potty" and pointed to her private area in the front.

64.     In April 2021, Ms. Willis attended a meeting with Defendant Jewell, Vice Principal Gerik, Special Education Director Steven McKissick, Ms. Heslep, teacher Tabitha Adams, and one or two other employees during which Crenshaw's inappropriate behavior toward Jane Doe and Student A was discussed.

65.     During the meeting, the administrators and employees also discussed Crenshaw being alone with students, locking the door to his classroom, and students' outbursts in his room.

66.     Defendant Jewell responded, "we can't be picky" and "who we have is what we have to work with."

67.     After the meeting, Defendant Jewell pulled Ms. Willis from the pre-kindergarten room assignment so that Ms. Willis could no longer monitor, supervise, or check on Crenshaw and his students.

68.     Defendant Jewell and other school employees treated Ms. Willis as though she had done something wrong by reporting Crenshaw's behavior and speaking up on behalf of the students.

69.     At the end of the 2020-2021 academic year, Defendants transferred Ms. Willis out of Lorena Primary School.

70.     Upon information and belief, at least one additional teaching aide reported Crenshaw's inappropriate behavior to Defendant Jewell during the 2020-2021 school year.

71.     By the end of March 2021, school officials knew that: Crenshaw was lying with Jane under a blanket at nap time in the dark, sitting her on his lap, locking her in a classroom with him, and exhibiting clear favoritism toward her; multiple employees were sufficiently disturbed

and upset about Crenshaw's behavior that they reported him to administrators and took photographs of his misconduct; and that Jane was experiencing vaginal and stomach pain.

72.     Upon information and belief, school officials and employees also knew that Crenshaw bought himself and Jane matching watches and gave her other gifts, including a jacket, which he did not do for other students.

73.     At no point during the 2020-2021 academic year did Defendants properly investigate Crenshaw.

74.     Defendant Jewell, instead of increasing supervision of Crenshaw, as was her job, ensured that he would go without monitoring or supervision, by, among other things, reassigning Ms. Willis and allowing Crenshaw to lock his classroom door when he was with Jane Doe.

75.     Upon information and belief, Defendants did not meaningfully reprimand, sanction, or institute any disciplinary measure against Crenshaw.

76.     Defendants did not inform Jane Doe's parents of the reports made about Crenshaw, including but not limited to the fact that he was lying with Jane under a blanket at school, keeping her in a locked classroom, or repeatedly seating her on his lap.

77.     Defendants did not report Crenshaw's misconduct to law enforcement.

78.     Although the School District's administrators and teachers are mandated reporters, neither Defendant Jewell nor any other administrator or teacher reported Crenshaw to the Texas Department of Family and Protective Services.

### Student A and Jane Doe Disclosed Crenshaw's Sexual Abuse

79.     On May 7, 2021, Jane Doe attended a school-sponsored field day and was not in the classroom.

80.     That day, when Ms. Heslep left the classroom, Crenshaw sexually abused Student A by placing his hand under her clothing and touching her genitals when she was lying down at nap time.

81.     That night, Student A told her parents that Crenshaw had "put his hand down [her] panties."

82.     On May 8, 2021, Jane's parents received notification of a police investigation into Crenshaw's inappropriate behavior toward a student.

83.     During a phone conversation on May 19, 2021, Defendant Jewell told Mary Doe she was sorry, started crying, and indicated she should have informed Mary earlier that year about Crenshaw's inappropriate behavior with Jane Doe.

84.     On June 13, 2021, Jane disclosed that Crenshaw sexually abused her.

85.     Jane told her mother that she was upset she never got to hang out with "Mr. Nic" (Crenshaw) at his house "because that is what boyfriends and girlfriends do."

86.     Jane stated she thought "Mr. Nic" was her boyfriend and "Mr. Nic" told her that she (Jane) was his girlfriend too.

87.     Crenshaw repeatedly told Jane that he loved her.

88.     Jane described "lots of things" that she would do with "Mr. Nic" as "boyfriend and girlfriend" and the "games" Crenshaw "played" with her during nap time.

89.     Jane stated that "Mr. Nic" routinely kissed her on the lips, put his "privy" on top of his jeans and had Jane touch and play with it, put Jane's hands in his pants and had her play with his "privy," pulled Jane's panties aside and touched Jane inside of her "privy" and then put his finger in his mouth, and that they tickled each other's "boobies" for fun.

90.     Jane also stated that she did not like it when "Mr. Nic" made her touch his "privy" because it was all slimy down at the bottom and she didn't want to touch that, so she "just stayed at the top of it."

91.     Crenshaw told Jane the "games" were "their secret" and she should not tell anyone about them.

92.     Crenshaw threatened Jane that if she told anyone he would get in trouble, and she would also be in trouble because he had everything written down.

### *Crenshaw Was Criminally Prosecuted, Pleaded Guilty, and Is Incarcerated*

93.     Mary and John Doe immediately reported Crenshaw's sexual abuse of Jane to law enforcement.

94.     Jane underwent a forensic interview on June 15, 2021, and as set forth in Affidavits / Complaints signed by Tom Dickson, then-Chief of Police for the City of Lorena, Jane disclosed, among other things, Crenshaw penetrated her vagina with his finger; "caused the child's hand to have sexual contact with his erect penis during nap time at the Lorena Primary School" and "she had to go wipe her hand off afterward because it had a substance on it."

95.     During an interview with law enforcement, Crenshaw admitted he had Jane "sit on his lap and the friction and movement caused him to become sexually aroused," and "he would then go to his residence and watch a pornographic video and masturbate to the thought of [her]."

96.     On or about August 5, 2021, a McLennan County Grand Jury indicted Crenshaw on five counts of Aggravated Sexual Assault of a Child, one count of Continuous Sexual Assault of a Child, and one count of Indecency with a Child by Contact, all arising out of Crenshaw's sexual abuse of Jane Doe from October 2020 through May 2021.

97.     On May 4, 2023, Crenshaw pleaded guilty to five counts of aggravated sexual assault of a young child, one count of continuous sexual abuse of a young child, and one count of indecency with a child by contact. Crenshaw was sentenced to no less than forty years in prison for the first five counts and twenty years for counts six and seven.

### The School District Refused to Provide Answers to the Does or the Public

98.     On or near July 7, 2021, the Texas Department of Family and Protective Services determined, based on a preponderance of the evidence, that Crenshaw sexually abused Jane Doe.

99.     John and Mary Doe filed a grievance with the School District, requesting that it provide an explanation as to how school officials and employees had permitted Crenshaw to lie under a blanket with Jane and sexually abuse her after multiple employees had reported his misconduct with Jane.

100.     The School District refused to conduct a Title IX investigation or provide any answers.

101.     During a school board meeting held on October 27, 2021, the School District's agent and attorney demeaned the Does by claiming they were out to attack the school.

### Defendants Caused Jane Doe Egregious Harm

102.     In July 2021, the Does moved from the Lorena area to a different city.

103.     Jane has been diagnosed with PTSD and generalized anxiety. She suffers nightmares, anger, distrust of others, physical pain, fear, confused sexual boundaries, and school avoidance. Jane experiences emotional turmoil when she hears the name "Nick" mentioned, even with respect to "St. Nick" at Christmas time, because it reminds her of "Mr. Nic" and the abuse he perpetrated against her.

104.     It is well known that the long-term effects of child sex abuse include but are not limited to later drug and alcohol abuse; depression; heart, liver, and pulmonary disease; poor work performance; smoking; suicide attempts; poor academic achievement; increased risk for future sexual abuse, assault, and violence; and early death.

105.     As is true with many victims of child sex abuse, it is reasonably expected that the injuries Defendants caused Jane will last throughout her life.

### *The School District Failed to Provide Essential Training and Education Regarding Teacher-on-Student Sexual Harassment*

106.     Nearly thirty years ago, the Fifth Circuit held that educator-on-student sexual abuse violates a student's Fourteenth Amendment Due Process rights, stating:

> "If the Constitution protects a schoolchild against being tied to a chair or against arbitrary paddlings, then surely the Constitution protects a schoolchild from physical sexual abuse--here, sexually fondling a 15-year old school girl and statutory rape--by a public schoolteacher. Thus, Jane Doe clearly was deprived of a liberty interest recognized under the substantive due process component of the Fourteenth Amendment. It is incontrovertible that bodily integrity is necessarily violated when a state actor sexually abuses a schoolchild and that such misconduct deprives the child of rights vouchsafed by the Fourteenth Amendment."

*Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443, 451-52 (5th Cir. 1994).

107.     In 1998, the U.S. Supreme Court stated:

> "The number of reported cases involving sexual harassment of students in schools confirms that harassment unfortunately is an all too common aspect of the educational experience.  No one questions that a student suffers extraordinary harm when subjected to sexual harassment and abuse by a teacher, and that the teacher's conduct is reprehensible and undermines the basic purposes of the educational system."

*Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 292 (1998).

108.     In January 2001, the U.S. Department of Education Office for Civil Rights ("OCR") issued *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other*

*Students, or Third Parties* ("2001 OCR Guidance"), informing all U.S. schools receiving Federal financial assistance that "[p]reventing and remedying sexual harassment in schools is essential to ensuring a safe environment in which students can learn." OCR also stated:

> "Sexual harassment is unwelcome conduct of a sexual nature.  Sexual harassment can include unwelcome sexual advances, requests for sexual favors, and other verbal, nonverbal, or physical conduct of a sexual nature.  Sexual harassment of a student can deny or limit, on the basis of sex, the student's ability to participate in or to receive benefits, services, or opportunities in the school's program.  Sexual harassment of students is, therefore, a form of sex discrimination prohibited by Title IX[.]"

109.    The OCR Guidance informed schools that, when a teacher is the harasser, students may not take action or even object, as students "may be encouraged to believe that a teacher has absolute authority over the operation of his or her classroom," and "may believe that any objections would be ineffective in stopping the harassment or may fear that by making objections he or she will be singled out for harassing comments or other retaliation."

110.    The 2001 Guidance also reminded schools they are responsible for taking prompt and effective action to stop and prevent the recurrence of a school employee's sexual harassment of a student.  OCR stressed the importance of proper training for those in authority, stating:

> "[S]chools need to ensure that employees are trained so that those with authority to address harassment know how to respond appropriately, and other responsible employees know that they are obligated to report harassment to appropriate school officials.  Training for employees should include practical information about how to identify harassment and, as applicable, the person to whom it should be reported."

111.    In 2004, the U.S. Department of Education issued *Educator Sexual Misconduct:  A Synthesis of Existing Literature*, a study that determined nearly **1 in 10** children attending U.S. public schools are subjected to sexual misconduct by a school employee before they graduate from

16

high school, and at any one time over 4.5 million students are suffering sexual misconduct perpetrated by a school employee.

112.    In 2005, the U.S. Supreme Court held that a private cause of action for retaliation may be brought under Title IX and explained:

> "Reporting incidents of discrimination is integral to Title IX enforcement and would be discouraged if retaliation against those who report went unpunished. Indeed, if retaliation were not prohibited, Title IX's enforcement scheme would unravel. . . Without protection from retaliation, individuals who witness discrimination would likely not report it, indifference claims would be short circuited, and the underlying discrimination would go unremedied."

*Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 180-81 (2005).

113.    In January 2006, OCR issued *Dear Colleague Letter – Sexual Harassment Issues*, stating, "[u]nfortunately, a significant number of students are still subjected to sexual harassment, which can interfere with a student's education as well as his or her emotional and physical well-being."  OCR reminded schools of their obligations "to take immediate and effective steps to end sexual harassment when it occurs, prevent its recurrence, and remedy its effects."

114.    On April 4, 2011, OCR sent *Dear Colleague Letter: Sexual Violence* ("2011 OCR Guidance") that issued a "call to action" to the nation's schools because of "deeply troubling" data regarding school sexual violence.

115.    The 2011 OCR Guidance reminded schools they have an obligation to investigate reports of sexual harassment, must designate at least one employee to coordinate and comply with Title IX responsibilities, and recommended schools provide training and education to employees and students on sexual harassment and violence.[2]

---

[2] The U.S. Department of Education withdrew this Dear Colleague Letter on September 22, 2017.  However, the statistics cited above have not changed, and the requirements set forth above have not been formally revised or otherwise superseded by the U.S. Department of Education.

116.    On April 24, 2013, OCR sent *Dear Colleague Letter: Retaliation*, to all U.S. public schools, reminding them they may not retaliate against persons who report a civil rights violation like sexual discrimination or harassment.

117.    On April 24, 2015, OCR issued *Dear Colleague Letter: Title IX Coordinators*, and *Title IX Resource Guide*, and reminded schools of their obligation to designate at least one employee as a Title IX Coordinator who is responsible for coordinating the school's efforts to comply with and carry out the school's Title IX responsibilities, pursuant to 34 C.F.R. §106.8(a). OCR stated, "In our enforcement work, OCR has found that some of the most egregious and harmful Title IX violations occur when a recipient fails to designate a Title IX coordinator or when a Title IX coordinator has not been sufficiently trained or given the appropriate level of authority to oversee the recipient's compliance with Title IX."

118.    In 2015, it was widely publicly reported that Texas has the highest reported rate of teacher sexual misconduct cases in the country.

119.    Governor Abbott, in his 2017 State of the State Address, cited this disturbing statistic, urged action, and stated Texas should "penalize administrators who turn a blind eye to such abuse."

120.    In 2017 and 2019 the Texas legislature enacted numerous laws specifically intended to combat educator sexual misconduct.  *See, e.g.*, Tex. Educ. Code Ann. §§ 21.006, 21.0061, 21.0062, 21.009, 21.004, 21.054, 21.0581, 22.092, 22.093.

121.    On May 19, 2020, OCR reminded schools of the prevalence of sexual harassment, including that 56% of girls suffer sexual harassment or assault at school before they graduate from high school. 85 Fed. Reg. at 30,075 (May 19, 2020). The 2020 regulations mandate proper training

for administrators and employees who handle and investigate sexual harassment matters. 85 Fed. Reg. at 30,559-60, 30,575.

122.     The Texas Education Agency similarly states that schools must develop effective programs, reporting policies, and employee training to prevent, recognize, and properly address child sex abuse, particularly given that school employees are the largest professional resource for reporting suspected child abuse in Texas.

123.     Upon information and belief, despite clear notice by the U.S. Supreme Court, Fifth Circuit, Governor Abbott, Texas Legislature, Texas Education Agency, and OCR regarding the imperative of proper training and education to ensure the School District complied with its obligations to prevent, identify, and remediate the effects of educator-on-student sexual misconduct, at all times relevant hereto the School District failed to provide training or education to administrators, staff, students, and parents regarding Title IX, educator-on-student sexual harassment, or retaliation against employees who report suspected child abuse or sexual harassment.

124.     Upon information and belief, at all times relevant hereto, the School District failed to provide training or education to administrators, staff, students, and parents on protecting students from sexual harassment, appropriate boundaries between employees and young students, grooming behaviors, identifying sexual harassment of a student, supervising employees reported for sexual misconduct, investigating reports of sexual harassment, interviewing or otherwise communicating with young victims and potential witnesses of sexual harassment, proper reporting of suspected sexual harassment, or supporting – and not retaliating against – employees who report grooming and sexual misconduct.

125.     Upon information and belief, at all times relevant hereto, the School District had no Title IX Coordinator or other employees designated to handle complaints of teacher-on-student sexual harassment who were adequately trained in receiving, coordinating, or investigating reports of employee-on-student sexual harassment.

126.     Upon information and belief, at all times relevant hereto, the School District failed to provide training or education to administrators, teachers, staff, students, and parents on any then-existing written policy or protocol regarding employee-on-student sexual harassment.

127.     The School District's lack of training is evidenced by, among other things, failing to properly investigate Crenshaw's reported sexual harassment against Jane Doe after receiving multiple credible reports and photographic evidence in January 2021 and early February 2021; eliminating supervision of Crenshaw in his interactions with Jane; permitting Crenshaw to isolate Jane Doe and hide his interactions with her; punishing and thereby discouraging employees from voicing concerns and intervening to protect Jane from Crenshaw; and failing to inform Jane's parents, the Texas Department of Family and Protective Services, or law enforcement of the many concerns and complaints regarding Crenshaw's grooming and inappropriate touching and conduct with respect to Jane.

128.     Upon information and belief, at all times relevant hereto, the School District did not have policies in place for Lorena Primary School with respect to supervision of employees and students, appropriate physical conduct between employees and students, classroom lighting and access, nap time protocols, or grooming.

## <u>COUNT I</u>
## Violation of Title IX, 20 U.S.C. § 1681, *et seq.*
## (Defendant School District)

129.    Plaintiff incorporates all preceding paragraphs into this Count by reference as though fully stated herein.

130.    Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

131.    The prohibition of discrimination on the basis of sex includes sexual harassment.

132.    The School District is a recipient of Federal financial assistance for Title IX purposes.

133.    Jane Doe suffered sexual harassment by Crenshaw that was severe, pervasive, and objectively offensive.

134.    The School District had substantial control over Crenshaw and the context in which he sexually harassed Jane Doe.

135.    The School District had actual notice of Crenshaw's sexual harassment against Jane Doe no later than January 2021 or February 4, 2021, when Ms. Sams informed Vice Principal Gerik and Principal Jewell that Crenshaw was frequently lying with Jane under a blanket at nap time, placing her on his lap, having her wear his clothing, and doting on her, and provided the administrators with photographic evidence capturing some of this misconduct, including Crenshaw lying on the ground with Jane straddling him.

136.    Crenshaw's reported misconduct constituted sexual harassment within the meaning of Title IX because Jane Doe obviously lacked the ability to consent to any of Crenshaw's physical

21

touching and advances, including but not limited to him lying with her under a blanket, physically placing her on his lap, and having her straddle him.

137.    Principal Jewell and Vice Principal Gerik possessed actual notice that Crenshaw had sexually harassed Jane Doe, was sexually harassing Jane Doe, and/or there was a substantial risk that he would sexually harass and abuse Jane Doe.

138.    Principal Jewell and Vice Principal Gerik were appropriate persons within the meaning of Title IX because the School District invested them with supervisory power over Crenshaw and the authority to address his sexual misconduct against Jane Doe, institute corrective measures on behalf of the School District, and eliminate the hostile environment Jane experienced.

139.    Crenshaw continued to sexually harass and abuse Jane Doe through early May 2021, when Student A reported his sexual abuse and Crenshaw was removed from Lorena Primary School.

140.    The School District acted with deliberate indifference to Crenshaw's observed and reported sexual harassment against Jane Doe, which caused her to suffer further sexual harassment and abuse by Crenshaw.

141.    The School District's response to Crenshaw's reported sexual harassment against Jane Doe was clearly unreasonable in light of the known circumstances, particularly given Jane's very young age and the authority and power teachers hold over students.

142.    The School District failed to take steps reasonably calculated to stop Crenshaw's harassment and abuse against Jane Doe.

143.    Through its acts and omissions, the School Districted acted with deliberate indifference to Crenshaw's observed and known sexual harassment against Jane Doe by, among other things:

a.  Choosing to not inform Mary and John Doe of the concerns and complaints expressed about Crenshaw's inappropriate and harassing conduct with Jane Doe;

b.  Failing to comply with Texas Education Code § 21.0061 and the School District's Policies and Procedures that Promote Student Physical and Mental Health, specifically, Student Safety; FFF, by not informing Jane's parents of Crenshaw's alleged sexual misconduct;

c.  Failing to protect Jane Doe from Crenshaw at school;

d.  Failing to properly investigate Crenshaw;

e.  Failing to take measures to stop or prevent Crenshaw from further victimizing Jane Doe;

f.  Failing to remove Jane Doe from Crenshaw's class;

g.  Permitting Crenshaw to access and sexually harass Jane Doe in her pre-kindergarten classroom, including by lying under a blanket with her during naptime, placing her on his lap, and touching, fondling, and kissing her;

h.  Failing to supervise Crenshaw, including when he was interacting with Jane Doe, and eliminating supervision of him altogether;

i.  Failing to ensure the pre-kindergarten classrooms were structured and operated in a way that permitted a clear line of sight of children at all times;

j.  Assigning Crenshaw to Jane Doe's small sub-group of pre-kindergarten students;

k.  Permitting Crenshaw to lock Jane Doe in a classroom with him;

l.  Creating a climate that tolerated Crenshaw's sexual harassment against Jane Doe and undoubtedly emboldened him;

m.  Failing to offer or provide educational accommodations, such as academic and psychological counseling, to Jane Doe after first observing and learning of Crenshaw's sexual harassment against her;

n.  Failing to report Crenshaw to law enforcement or the Texas Department of Family and Protective Services;

o.  Failing to properly train administrators, staff, aides, and families on Title IX and teacher-on-student sexual harassment; and

      p.     Retaliating against or otherwise discouraging school employees from reporting Crenshaw's sexual harassment against Jane Doe.

144.    The School District refused to take voluntary action to remedy the Title IX violation reported to it.

145.    Jane has suffered physical, psychological, and emotional harm, and loss of educational benefits, due to the School District's many failures to take appropriate steps to respond to and prevent Crenshaw's continued sexual harassment and abuse against her.

146.    As a direct and proximate result of the School District's deliberate indifference, Jane Doe suffered and continues to suffer injuries for which she is entitled to be compensated, including but not limited to:

      a.     Past, present, and future physical pain;
      b.     Impaired educational and future earning capacity;
      c.     Attorneys' fees and costs; and
      d.     Such other and further relief as this Court deems just and proper.

**<u>COUNT II</u>**
**Violation of Plaintiff's Constitutional Rights, pursuant to 42 U.S.C. § 1983**
**Failure to Train**
**(Defendant School District)**

147.    Plaintiffs incorporate all preceding paragraphs into this Count by reference as though fully stated herein.

148.    Children like Jane Doe have a well-established right to be free from teacher sex abuse, which violates a child's right to personal security and bodily integrity guaranteed by the Fourteenth Amendment to the U.S. Constitution.

149.    The Lorena Independent School District Board of Trustees is the policymaker for purposes of 42 U.S.C. § 1983.

150.    Lorena Independent School District Board of Trustees and the School District are "one and the same entity." *New Caney Indep. Sch. Dist. Bd. of Trs. v. Burnham Autocountry*, 960 S.W.2d 957, 959 (Tex. App. 1998)

151.    At all times relevant hereto, the School District was a policymaker having the duty to train, and failed to adequately train, administrators, staff, students, and parents on Title IX, protecting students from sexual harassment, appropriate boundaries between employees and young students, grooming behaviors, identifying sexual harassment of a student, supervising employees reported for sexual misconduct, investigating reports of sexual harassment, interviewing or otherwise communicating with young victims and potential witnesses of sexual harassment, proper reporting of suspected sexual harassment, and supporting – and not retaliating against – employees who report grooming and sexual misconduct.

152.    The School District failed to train its administrators, staff, students, and parents despite the *obvious* need for this training in order to prevent, identify, and remediate the effects of educator-on-student sexual misconduct.

153.    Numerous authorities, including U.S. Supreme Court, Fifth Circuit, Texas Executive and Legislature, Texas Education Agency, and OCR made clear and gave notice to the School District that its employees will confront educator-on-student sexual harassment with regularity given the high predictability, recurrence, and prevalence of educator-on-student sexual assault, harassment, and abuse in schools. Thus, it was foreseen and inevitable that the School District's administrators and employees would encounter recurrent situations involving sexual abuse that implicated students' Constitutional rights, and it did, in fact, encounter those recurring situations.

154.     The School District failed to adequately train administrators, staff, students, and parents, despite the highly predictable consequence that this failure would result in educator sexual abuse of students and violation of students' substantive due process rights guaranteed by the U.S. Constitution.

155.     The School District failed to adequately train administrators, staff, students, and parents, and thereby prevent, identify, stop, and remediate educator-on-student sexual harassment, despite the clearly established and well-known dangers of educator-on-student sexual harassment and abuse in U.S. and Texas schools, and thereby was deliberately indifferent to Jane Doe's substantive due process rights guaranteed by the U.S. Constitution.

156.     The School District's failure to adequately train its administrators, staff, students, and parents effectively denied Jane Doe's clearly established Constitutional rights.

157.     As a direct and proximate result of the School District's failure to train, Jane suffered, and continues to suffer, injuries for which she is entitled to be compensated, including but not limited to:

   a. Past, present, and future physical and psychological pain, suffering, and impairment;
   b. Medical bills, counseling, and other costs and expenses for past and future medical and psychological care;
   c. Impaired educational and future earning capacity;
   d. Attorneys' fees and costs; and
   e. Such other and further relief as this Court deems just and proper.

**<u>COUNT III</u>**
**Violation of Plaintiff's Constitutional Rights, pursuant to 42 U.S.C. § 1983**
**Failure to Supervise**
**(Defendant Jewell in Her Official and Personal Capacity)**

158.     Plaintiff incorporates all preceding paragraphs into this Count by reference as though fully stated herein.

159.     Jane Doe had a well-established right to be free from teacher sex abuse, and Crenshaw's sexual abuse violated her right to personal security and bodily integrity guaranteed by the Fourteenth Amendment to the U.S. Constitution.

160.     Defendant Jewell's job responsibilities and duties required her to supervise and ensure proper supervision of all staff and personnel at Lorena Primary School, including Crenshaw.

161.     Defendant Jewell, through the reports of multiple employees and photographic evidence, learned of facts and/or a pattern of inappropriate sexual behavior by Crenshaw that pointed plainly toward the conclusion that he was sexually abusing Jane Doe and/or that demonstrated the obvious risk he would sexually abuse Jane.

162.     Defendant Jewell demonstrated deliberate indifference toward Jane Doe's constitutional rights by failing to supervise Crenshaw and eliminating supervision of him.

163.     Defendant Jewell disregarded the highly predictable, known and/or obvious consequence of the failure to supervise Crenshaw, namely that Crenshaw would continue and/or exacerbate his sexual misconduct against Jane Doe.

164.     Defendant Jewell's failures to supervise Crenshaw resulted in his continued sexual harassment and abuse of Jane Doe and constitutional injury to her.

165.     At all times relevant hereto, Defendant Jewell was acting under color of state law.

166.     Defendant Jewell is not entitled to qualified immunity because her actions and omissions were objectively unreasonable in light of clearly established law at the time.

167.     Defendant Jewell acted with reckless and callous indifference to Jane Doe's civil rights, federally protected rights, and Constitutional rights.

168.    As a direct and proximate result of Defendant Jewell's failure to supervise, Jane

Doe suffered and continues to suffer injuries for which she is entitled to be compensated, including

but not limited to:

     a.   Past, present, and future physical and psychological pain, suffering, and impairment;
     b.   Medical bills, counseling, and other costs and expenses for past and future medical and psychological care;
     c.   Impaired educational and future earning capacity;
     d.   Punitive damages;
     e.   Attorneys' fees and costs; and
     f.   Such other and further relief as this Court deems just and proper.

### COUNT IV
**Violation of Plaintiff's Constitutional Rights, pursuant to 42 U.S.C. § 1983**
**Absence of Policy**
**(Defendant School District)**

169.    Plaintiff incorporates all preceding paragraphs into this Count by reference as

though fully stated herein.

170.    The School District is considered a person under 42 U.S.C. § 1983.

171.    The Lorena Independent School District Board of Trustees is the policymaker for

purposes of 42 U.S.C. § 1983.

172.    Lorena Independent School District Board of Trustees and the School District are

"one and the same entity." *New Caney*, 960 S.W.2d at 959.

173.    Crenshaw's sexual harassment and abuse of Jane Doe violated her right to personal

security and bodily integrity guaranteed by the Fourteenth Amendment to the U.S. Constitution.

174.    At all times relevant hereto, the School District had no policies in place for Lorena

Primary School or its pre-kindergarten classes with respect to supervision of employees and

students, appropriate physical conduct and boundaries between employees and students, nap time

protocols, grooming behavior, and proper classroom set-up, lighting, and access.

175.    The School District failed to institute or promulgate these policies despite the plainly obvious need for such policies.

176.    Numerous authorities, including the U.S. Supreme Court, Fifth Circuit, Texas executive and legislative branches, Texas Education Agency, and OCR, made clear to the School District that school employees will confront student sexual harassment and abuse with regularity, given the high predictability, recurrence, and prevalence of educator-on-student sexual harassment in abuse in schools, particularly in Texas. It was inevitable that the School District's administrators and employees would encounter recurrent situations involving sexual harassment and abuse that implicated students' Constitutional rights, and they did, in fact, encounter those recurring situations.

177.    The School District's failure to institute these policies was so likely to result in the violation of children's Constitutional rights that the School District can reasonably be said to have been deliberately indifferent to the need for the policies.

178.    The School District had actual or constructive notice that its failure to institute or promulgate these policies would result in the violation of children's rights to personal security and bodily integrity guaranteed by the Fourteenth Amendment to the U.S. Constitution.

179.    The highly predictable consequence of the School District failing to institute or promulgate these policies was the violation of children's long-established right to personal security and bodily integrity guaranteed by the Fourteenth Amendment to the U.S. Constitution.

180.    As a direct and proximate result of the School District's failure to institute or promulgate these policies, Jane Doe suffered and continues to suffer injuries for which she is entitled to be compensated, including but not limited to:

>    a.    Past, present, and future physical and psychological pain, suffering, and impairment;

b.   Medical bills, counseling, and other costs and expenses for medical and psychological care;

c.   Impaired educational and earning capacity;

d.   Attorneys' fees and costs; and

e.   Such other and further relief as this Court deems just and proper.

**COUNT V**
**Violation of Plaintiff's Constitutional Rights, pursuant to 42 U.S.C. § 1983**
**Arbitrary and Conscience-Shocking Executive Action**
**(Defendant Jewell in Her Official and Personal Capacity)**

181.   Plaintiff incorporates all preceding paragraphs into this Count by reference as though fully stated herein.

182.   Jane Doe's right to bodily integrity and personal security is an established and deeply rooted fundamental right and liberty guaranteed by the substantive due process clause of the Fourteenth Amendment to the U.S. Constitution.

183.   Defendant Jewell violated Jane Doe's fundamental rights and liberties by taking discretionary, conscience-shocking, arbitrary executive action that directly interfered with Jane's fundamental right to bodily integrity and personal security.

184.   Defendant Jewell's discretionary, conscience-shocking, and arbitrary executive actions included, *inter alia*, her post-January 2021 decisions: to not supervise or monitor Crenshaw's conduct at school with Jane Doe; to allow him to routinely lie under a blanket with Jane Doe; to grant Crenshaw additional access to Jane by placing her in his pre-kindergarten sub-group; to allow him to isolate Jane behind a locked classroom door; to not investigate Crenshaw for sexual harassment of Jane Doe; to remove existing monitoring and supervision of his conduct with Jane; to discourage employees from voicing concerns about Crenshaw's interactions with Jane and intervening to help her; to not inform Jane's parents of the concerns and complaints made

30

regarding Crenshaw's interactions with Jane; to not discipline or materially reprimand Crenshaw; and to not report to law enforcement or CPS, all which left five-year-old Jane Doe vulnerable to, and the subject of, Crenshaw's continued sexual harassment and abuse at school and violation of her clearly-established substantive due process rights to bodily integrity and personal security.

185.   Defendant Jewell's actions infringed upon the decencies of civilized conduct, were offensive to human dignity, and interfered with rights implicated in the concept of ordered liberty.

186.   Defendant Jewell had time to fully consider the potential consequences of her actions and conduct, and to make an unhurried judgment concerning Crenshaw's misconduct and the type of harm that would result from permitting Crenshaw to access Jane Doe without supervision, monitoring, sanction, or restriction – namely Crenshaw's sexual harassment and abuse of Jane Doe and the devastating harm Jane would suffer from that harassment and abuse.

187.   Defendant Jewell was aware of facts from which she could infer that Crenshaw posed a substantial risk of serious harm to Jane Doe, and she did infer that risk, which was obvious.

188.   At all relevant times hereto, Defendant Jewell was acting under color of state law.

189.   Defendant Jewell acted with deliberate indifference, reckless disregard, and callous indifference to the substantial risk of serious harm that Crenshaw obviously posed to Jane Doe.

190.   Defendant Jewell's actions served no legitimate interest whatsoever and demonstrated the type of egregious and extreme caprice that shocks the conscience.

191.   As a direct and proximate result of Defendant Jewell's actions, inaction, deliberate indifference to, and violation of Jane Doe's clearly established Constitutional rights, Jane suffered and continues to suffer injuries for which she is entitled to be compensated, including but not limited to:

a.   Past, present, and future physical and psychological pain, suffering, and impairment;

b.      Medical bills, counseling, and other costs and expenses for medical and psychological care;

c.      Impaired educational and earning capacity;

d.      Punitive damages;

e.      Attorneys' fees and costs; and

f.      Such other and further relief as this Court deems just and proper.

## PRAYER FOR RELIEF

Plaintiff prays the Court for judgment in favor of Plaintiff and against Defendants, awarding Plaintiff compensatory damages in an amount to be established at trial, punitive damages, reasonable attorneys' fees and costs, legal interest, and such other relief as the Court may deem just and proper under the circumstances.

## JURY DEMAND

Plaintiff respectfully demands a trial by a jury.

Respectfully submitted,

Date:   August 3, 2023                   By: /s/ William W. Johnston
                                          William W. Johnston
                                          State Bar No. 10846700
                                          **LONCAR LYON JENKINS**
                                          321 N. Lee Avenue
                                          Odessa, TX 79761
                                          (432) 337-4879
                                          (432) 337-4880 (Facsimile)
                                          bjohnston@loncarlyonjenkins.com


                                          Monica H. Beck*
                                          Bailor Bell*
                                          **THE FIERBERG NATIONAL LAW GROUP, PLLC**
                                          201 East 17th Street
                                          Traverse City, MI 49684
                                          (231) 933-0180

(231) 252-8100 (Facsimile)
mbeck@tfnlgroup.com
bbell@tfnlgroup.com
*pro hac vice* motions to be filed

*Attorneys for Plaintiffs*